PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN L. LAWRENCE, | ) | |
| | ) | CASE NO.  5:14CV00127 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| TIMKEN COMPANY, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | [Resolving ECF No. 34] |

Pending before the Court is Defendant Timken Company's Motion for Summary

Judgment.  ECF No. 34.  The Court has been advised, having reviewed the record, including the

parties' briefs, attachments thereto, and the applicable law.  For the reasons provided below, the

Court hereby grants Defendant's Motion for Summary Judgment.

**I.  Factual and Procedural History**

In June 2010, Timken Company ("Defendant"), a global manufacturer of bearings,

transmissions, and related products, hired Plaintiff Karen L. Lawrence (formerly Krieg) as a

Senior Forecasting Analyst.  ECF No. 7 at PageID #: 28 ¶ 9; ECF No. 34-1 at PageID #: 240.

Prior to her employment with Defendant, Plaintiff had acquired a Master's Degree in Business

Administration, a Bachelor's Degree in Finance, and had five years of relevant work experience

at another company.  ECF No. 7 at PageID #: 29 ¶ 10.  As Senior Forecasting Analyst, Plaintiff's

responsibilities included "analyzing, preparing and reporting the month-end sales results and then

(5:14CV00127)

creating a forecast by product, [and] by part number for the remainder of the year on a monthly

basis" for Timken's "Mobile Industries" group which consisted of Timken's light vehicle, heavy

truck, off-highway, automotive after-market and rail units.  ECF No. 34-3 at PageID #: 267-68,

26:1-7; 30:2-12.  In 2012, Defendant promoted Plaintiff to Principal Forecasting Analyst.  ECF

No. 45 at PageID #: 843.  Plaintiff testified that her responsibilities did not change, but she

received an increased salary.  ECF No. 34-3 at PageID #: 267, 26:21-27:11.  The monthly

forecasts encompassed 70% of Plaintiff's total job duties.  ECF No. 34-3 at PageID #: 267 at

29:3-7.  Plaintiff described the forecasting process as very time-consuming, tedious, and

voluminous because she entered large amounts of data into a spreadsheet manually.  ECF No. 34-

3 at PageID #: 267, 26:8-20.  According to Plaintiff, she spent three weeks of each month on this

process.  ECF No. 34-3 at PageID #: 299, 155:15-21.

In 2012 in a company reorganization, Defendant combined the Process and Mobile

Industry side of its Bearings and Power Transmission ("B&PT") Group.  ECF No. 34-5 at

PageID #:328, 20:5-8.  Robin Zollinger ("Zollinger") testified that she became Defendant's Sales

Forecasting Manager for Mobile and Process Industries in late 2012.  ECF No. 34-5 at PageID

#:328, 20:5-10.  While Zollinger maintained her own analysis responsibilities, she supervised

"Principal Analysts" who also performed forecasting duties - Plaintiff, Michael Sopczak[1], and

Anthony Harley performed forecasting for the Mobile Industries Unit and Shane Gibson handled

---

[1]  Shelly Chadwick, formerly the Controller for Process Industries, testified that
Michael Sopczak left the Sales Forecasting team as part of the company reorganization in
2012, and he was assigned elsewhere.  ECF No. 34-7 at PageID #: 383, 19:19-23.
Plaintiff also testifies that Michael Sopczak left the Sales Forecasting team.  ECF No. 34-
3 at PageID #: 275, 58:20-23; 132:10-15.

2

(5:14CV00127)

forecasting for the Process Industries Unit.  ECF No. 45 at PageID #: 843.  At the time Defendant

submitted responses to interrogatories, Anthony Harley, Shane Gibson, and Robin Zollinger had

been employed by Defendant for 17, 10, and 16 years, respectively.  ECF No. 34-14 at PageID #:

450, Interr. 9.  Zollinger reported to Shelly Chadwick ("Chadwick"), then the Controller for

Process Industries and currently Defendant's Treasurer.  ECF No. 34-5 at PageID #: 341, 69:5-7.

       In early 2013, Defendant began exploring ways to automate its forecasting process

through a software called Logility.  ECF No. 34-3 at PageID #: 273, 50:22-53:2.  Defendant also

sought to reduce the number of forecasting reports from once a month to once every other month.

ECF No. 34-3 at PageID #: 273, 53:19-25.  Zollinger believed that the Mobile Industries

forecasts were more accurate than the forecasts of other business segments.  ECF No. 34-5 at

PageID #: 341, 53:17-21.  Defendant believed that the use of Logility would eventually eliminate

at least one-and-half, if not two, full-time positions in forecasting.  ECF No. 34-3 at PageID #:

273, 54:1-5.  On January 10, 2013, Chadwick and Zollinger made a presentation on the future of

the sales forecasting process with the introduction of Logility.  ECF No. 45-7.  Plaintiff helped to

outline the initial planning process of transitioning from manual to automated forecasting.  ECF

No. 34-3 at PageID #: 273, 51:14-16; ECF No. 34-7 at PageID #: 384, 21:12-21.   When asked

about the origin of the concept to automate sales forecasting, Chadwick testified:

> It came from Robin and I.  But I would say that I pushed the idea a little bit
> because when I came in, I saw how very manual the process was and was very
> surprised to see the number of hours we were putting in to maintaining a
> spreadsheet that was very difficult to actually understand, [a]nd it was 100,000
> cells on its best day, which is very cumbersome.  And it was very obvious to me,
> based on my experience, that we could do that in a much more automated,
> simplified way.

3

(5:14CV00127)

ECF No. 34-7 at PageID #: 383, 20:4-14.  Defendant believed that the use of Logility would

automate most, if not all, of Plaintiff's forecasting work.  ECF No. 34-14 at PageID #: 451.

Plaintiff testified that Logility would not completely automate the forecasting process because

the data it produced would have to be reviewed for errors.  ECF No. 34-3 at PageID #: 274, 57:9-

19.  Chadwick admitted that Logility was just a piece of the forecasting solution, and it, alone,

did not render the Sales Forecasting group obsolete.  ECF No. 34-7 at PageID #: 395, 68:24-

69:12.

While the transition to automation was underway, Defendant had already begun "Project

Red" during the end of summer 2013.  ECF No. 34-1 at PageID #: 237; ECF No. 34-7 at PageID

#: 388, at 40:3-8.  Project Red was Defendant's attempt to reduce its workforce in response to a

decrease in company profitability.  ECF No. 34-7 at PageID #: 388, 37:2-4.  Part of the

company's reorganization included the elimination of the entire Sales Forecasting group, of

which Plaintiff was a member.  ECF No. 34-1 at PageID #:237.  Chadwick further stated that

while Logility alone did not render the Sales Forecasting group obsolete, Project Red as a whole

did.  ECF No. 34-7 at PageID #: 396, 69:13-18.  Chadwick was partially responsible for

identifying cost savings opportunities and maintained the spreadsheet that detailed the various

positions to which employees moved.  ECF No. 34-7 at PageID #: 388, 37:8-19.  Chadwick

testified that the general cost of employee benefits, as a whole, were weighed in the decision-

making process for determining cost savings opportunities, but denied that Defendant used the

cost of individual benefits to determine who should be eliminated.  ECF No. 34-7 at PageID #:

388, 38:21-39:10.  Six of the 42 U.S.-based associates from the B&PT Group were terminated as

4

(5:14CV00127)

a result of Project Red. ECF No. 34-14 at PageID #:453, Interrog. 6. Altogether, more than 487

positions were eliminated from the Company worldwide as part of the reorganization effort.

ECF No. 34-14 at PageID #: 453, Interrog. 15. During Chadwick's deposition, the following

exchange occurred:

> Q: How was Karen Lawrence at this time chosen to have her – how was Karen
> Lawrence's position chosen to be eliminated?
> A: . . . [T]his sales forecasting project was already in process when Project Red
> began. And Robin and I were already looking at how much free time had been
> created by some of the improvements and also from the fact that the sales forecast
> was no longer required every month so she had free capacity . . . we could see a
> path to the process becoming much more automated to where there would not be a
> lot to the position, so that position was chosen for elimination.

ECF No. 34-7 at PageID #: 389, 41:24-42:9. Chadwick worked with Michael Morgan

("Morgan"), Vice President and Controller for B&PT, in implementing Project Red. ECF No.

34-7 at PageID #: 388, 37:2-25. Zollinger testified that Chadwick did not ask for her input

regarding which positions should be terminated. ECF No. 34-5 at PageID #: 351, 110:4-12.

Barry Martin ("Martin"), Director of Organizational Advancement ("OA") (akin to a company's

human resources department), worked primarily with the managers in Mobile Industries to help

identify "opportunities to reduce costs in their group, which could be through job combinations,

restructuring the group, [or] changes in span of control. It could be job eliminations." ECF No.

34-10 at PageID #: 431, 11:20-23. In June or July of 2013, Plaintiff's fellow team member,

Anthony Harley, left the Sales Forecasting team to become a Plant Controller. ECF No. 34-5 at

PageID #: 343, 78:15-25, 79-80; PageID #: 348, 100:7-25. Plaintiff, now the only forecast

analyst for Mobile Industries, assumed Anthony Harley's work responsibilities and those of

Michael Sopczak, who was no longer part of Mobile Industries. ECF No. 34-3 at PageID #: 274,

(5:14CV00127)

58:8-23.  Plaintiff testified that as a result, even a reduction in the number of forecasting reports would not have minimized her workload.  ECF No. 34-3 at PageID #: 275, 58:4-23.  Plaintiff testified that the bulk of her work still remained the preparation of forecasting reports.  ECF No. 34-3 at PageID #: 275, 59:1-8.

Regarding the decision to eliminate the Sales Forecasting group,  Defendant stated "[d]ue to the directive to achieve significant cost containment and reduction, Defendant could not transfer all four individuals to other positions.  Of these four individuals, Plaintiff had the fewest years of service."  ECF No. 34-14 at Page ID#: 453, Interr. 14.  Chadwick stated that Plaintiff's seniority was not considered in the decision to eliminate Plaintiff's position because it was the entire group that was being eliminated.  ECF No. 34-7 at PageID #: 397, 73:16-20.  Martin stated that "Karen's seniority was not a factor in the decision to eliminate her position.  It was however, considered in the decision to transfer her to another opportunity in the company."  ECF No. 34-10 at PageID #: 437, 33:23-34:1.  In mid-October of 2013, Morgan gave an initial presentation, in the presence of Martin, proposing, among other things, the elimination of Plaintiff's position.  ECF No. 34-10 at PageID #: 435, 22:21-23:5.  Plaintiff was placed on the Company's "free agent list", which was circulated among company managers  in case there were any job openings in their departments and had interest in one of the free agents.  ECF No. 34-7 at PageID #: 397, 73:21-23; 75:16-76:9.  It does not appear that any manager expressed interest in Plaintiff or her qualifications.  On October 31, 2013, the decision to terminate Plaintiff was finalized.  ECF No. 34-10 at PageID #: 435, 25:8-26:8; ECF No. 34-14 at PageID #: 452, Interrog. 12.

6

(5:14CV00127)

Meanwhile, in late July of 2013, Plaintiff requested a work-from-home arrangement from Zollinger so that she could provide care for her fiancé, Bill Lawrence, a disabled war veteran stricken with an aggressive recurrence of otherwise medically managed cancer.[2] ECF No.7 at PageID #:30, ¶¶ 13-15.  Defendant did not have a policy that allowed employees to work from home.  After receiving approval from Chadwick and from OA, however, Zollinger approved the alternative work arrangement, in which Plaintiff would work from home two days a week.[3] ECF No. 34-14 at PageID #: 452, Interrog. 20; ECF No. 34-3 at PageID #: 279, 77:3-5; Page ID#: 280 at 79:5-12; ECF No. 35.  Plaintiff married her fiancé on August 25, 2013.  ECF No. 34-3 at PageID #: 276, 63:20-23.  She added him to her medical plan and his benefits became effective as of the date of their marriage.  ECF No. 34-3 at PageID #: 276, 63:20-64:9.  His condition continued to decline in late 2013 and they sought care in Philadelphia.  ECF No. 34-3 at PageID #: 276, 63:71-82.  Plaintiff used the work-from-home arrangement to transport Mr. Lawrence to and from his medical appointments in Philadelphia, and to care for him after the chemotherapy treatments.  ECF No. 34-3, PageID #: 281 at 83:17-25; 84-93.  Plaintiff had arranged to check in with Zollinger during their routine meetings every other week to discuss the continuation of the

---

[2]  On the same day, Plaintiff and Zollinger raised their voices at each other in an argument.  ECF No. 34-3 at PageID #: 298, 150:25-151:11; ECF No. 45-1. The nature of the argument is unclear, but Plaintiff testified that it was their only argument.  ECF No. 34-3 at PageID #: 298 at 150:25-151:11.  Zollinger wrote in an e-mail to Chadwick that Plaintiff apologized for her approach to Zollinger.  ECF No. 45-1.

[3]  In the e-mail informing Chadwick of Plaintiff's request for an alternative work arrangement, Zollinger stated that Plaintiff "found out some not so great news about her friend on Monday.  His cancer has grown significantly and spread."  ECF No. 35. Zollinger learned that Plaintiff married Bill in September 2013.  ECF No. 34-3 at PageID #: 104,  8-11.

7

(5:14CV00127)

alternative work arrangement (ECF No. 34-3 at PageID #: 301, 164:11-16), but Plaintiff testified

that Zollinger frequently inquired as to how long the arrangement would be necessary outside of

the established meetings.  ECF No. 34-3 at PageID #: 302, 166:20-167:19.  In mid-October,

Zollinger sent Chadwick an e-mail detailing Plaintiff's request for time off (requesting a half-day

to attend her uncle's funeral and a vacation day as "personal time away") and expressed her

concern that Plaintiff's schedule would negatively impact the sales forecast.  ECF No. 34-5 at

PageID #: 349, 102:14-103:23; ECF No. 45-6.

At the time Morgan initially proposed the elimination of Plaintiff's position, he did not

know that Plaintiff was in a relationship with someone who had cancer.  ECF No. 34-6 at PageID

#: 369, 29:20-30:6.  He learned of the relationship during the late stages of Project Red.  ECF

No. 34-6 at PageID #: 369, 30:4-6.  On November 1, 2014, Chadwick e-mailed Martin the

following:

> FYI, Barry you are aware of the situation with Karen Lawrence and her personal
> situation.  Robin has expressed some concern over her time working vs. out of
> office.  We have given her the opportunity to work 2 days per week from home
> while her new husband is getting cancer treatment.  However, she has been taking
> a bit more than that and Robin spoke to her last week about her concerns over
> Karen's availability.
>
> Today, Robin was supposed to be on vacation and Karen was to be in the office.
> Robin came in today unexpectedly to find Karen not here (and she has not called
> or emailed).  We are trying to be sensitive to the personal situation, but also firm
> in our expectations.  Should we take any disciplinary actions . . . . or not since she
> is on the project red list?

ECF No. 45-5.  On November 3, 2013, Martin responded, stating "Karen was approved for job

elimination.  This conversation will take place next week.  Nevertheless, I think it will be

unnatural if we don't say something to her on Monday when she returns to work."  ECF No. 45-

8

(5:14CV00127)

5.  Plaintiff later testified that her November 1, 2013 absence was due to oversleeping because of the late arrival of her return flight from her husband's treatment.  ECF No. 34-3 at PageID #: 304, 174:2-14.

On November 4, 2014, Plaintiff inquired about FMLA for the first time.  ECF No. 34-3 at PageID #: 269, 36:18-37:9.  Plaintiff exchanged e-mails with Jeaneen McDaniels ("McDaniels"), Defendant's Employee Relations and Workplace Compliance Manager, in which McDaniels arranged for Plaintiff to contact the medical department of human resources to see if she qualified for FMLA.[4]  ECF No. 45-4 at 1.  Plaintiff testified that McDaniels was very responsive and attentive to Plaintiff's inquiries and did nothing to dissuade her from applying for FMLA.  ECF No. 34-3 at PageID #: 269, 37:20-41:7.  Plaintiff did not speak with Zollinger, Chadwick, or Morgan regarding her FMLA inquiries, nor did she have any reason to believe that OA spoke with them regarding her request.  ECF No. 34-3 at PageID #: 272, 47:24-49:8.  On November 15, 2013, Morgan informed Plaintiff of her termination.  ECF No. 34-3 at PageID #: 295, 138:14-25.  Plaintiff had not yet completed the FMLA forms.  ECF No. 34-3 at PageID #: 271, 44:24-25.  Mr. Lawrence passed away on April 24, 2014.  ECF No. 34-3 at PageID #: 264, 17:18-19.

During the later part of 2013, Defendant further consolidated its Mobile and Process Units (ECF No. 34-7 at PageID #: 381, 12:10-13:19) and created C.F.A.S.T, the Cross-

---

[4] Although Plaintiff does not mention it in her opposition, Defendant states in its Answers to Interrogatories that "[o]n October 31, 2014, Jeaneen McDaniels, Manager – Associate Relations and Thomas Stone, Manager – OA – Steel and Associate & Industrial Relations, reviewed and approved Plaintiff's job elimination."  ECF No. 34-14 at PageID #: 452, Interr. 12.  The approval came 5 days before Plaintiff inquired about FMLA and received helpful responses.

(5:14CV00127)

Functional Analytical Support Team, managed by Zollinger (ECF No. 34-5 at PageID #: 341, 70:25), now the Financial Planning and Analysis Manager.  ECF No. 34-5 at PageID #: 341, 67:6.  C.F.A.S.T conducts a "wide array of financial analyses", including the sales forecasting reports formerly performed by the Sales Forecasting group.  ECF No. 34-5 at PageID #: 341, 71-72.  C.F.A.S.T employees included Plaintiff's former Sales Forecasting co-worker, Shane Gibson, and Meghan Dietz ("Dietz"), a former intern for Defendant who became an employee on a rotational schedule in different departments.  ECF No. 34-5 at PageID #: 341, 71:12-14; ECF No. 34-8 at PageID Nos. 403-04, 12:25-13:2; PageID #: 412, 46:13-25.  Implementation of Logility did not completely automate the sales forecasting process for Mobile Industries.  Less than 20% of Plaintiff's former job responsibilities were assigned to Dietz and Gibson, who were primarily responsible for other tasks.  ECF No.34-14 at PageID #: 453, Interr. 16.  Including preparation time,  Plaintiff previously needed three weeks to generate a sales forecast report.  ECF No. 34-3 at PageID #: 267, 26:8-16; Page ID #: 299 at 155:8-17.  With Logility, the entire process took 10 days.  ECF No. 34-8 at PageID #: 410.  Defendant considered the remaining forecasting responsibilities to be entry-level clerical tasks.  ECF No. 14 at PageID #: 453,  Interr. 16.  Dietz testified that she performed the ad hoc inquiry reports, ECF No. 34-8 at PageID #: 410 at 40:3-17, formerly supplied by Plaintiff.  ECF No. 34-5 at PageID #: 127, 128:8-17.  On or about October 10, 2014, Defendant posted a job opening for a Senior Financial Analyst, the description of which included, in relevant part:

> The hired Senior Financial Analyst will be exposed to all major FP&A processes and functions for Timken Bearings and Power Transmission Segment . . . including the segment's financial monthly forecast, annual budgeting process, and variance analysis.  S/he will provide strategic support to senior management

(5:14CV00127)

> including preparing board presentations, financial presentations, Investment
> analysis industry/peer group comparisons, new business opportunities, acquisition
> analysis and other projects requested by senior management.

ECF No. 45-8. Dietz rotated out of C.F.A.S.T around the same time that Defendant posted the

Senior Financial Analyst position. ECF No. 34-6 at PageID #: 373, 42:15-43:14.

Plaintiff filed the instant lawsuit alleging that Defendant terminated her (1) in retaliation

for her request for leave under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2611 and (2)

because of her association with a person with a disability, in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101. ECF No. 7. Subsequently, Plaintiff voluntarily dismissed

with prejudice her third claim brought under E.R.I.S.A. ECF No. 39. Meanwhile, on September

11, 2014, Plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission

("OCRC"). ECF No. 34-13. Defendant filed a Motion for Summary Judgment. ECF No. 34.

Plaintiff opposed. ECF No. 45. Defendant filed a Reply. ECF No. 47. Shortly after the motion

was fully briefed, On January 29, 2015, the OCRC issued Plaintiff a Right to Sue Letter. ECF

No. 48-1. Defendant's Motion is now ripe for adjudication.

## II. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

see also Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required

to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the

11

(5:14CV00127)

pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary

12

(5:14CV00127)

judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment.  *Id.*

### III.  Analysis

#### A.  Family Medical Leave Act

Plaintiff alleges that her "retaliatory termination was a direct and proximate result of her exercise of protected rights under 29 U.S.C. §2611 et seq."  ECF No. 7 at PageID #: 31 ¶ 24.  Defendant moves for summary judgment on this claim, arguing that Plaintiff did not invoke her FMLA rights prior to the decision to terminate her.

The FMLA provides qualifying employees with the right to twelve weeks of unpaid leave each year to care for family members with serious health conditions.  29 U.S.C. § 2612(a).   The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)."  *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir.2004).  The interference theory makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."  29 U.S.C. § 2615(a)(1).  The retaliation or "discrimination" theory arises from 29 U.S.C. § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  To make a valid claim

13

(5:14CV00127)

for retaliation, in the absence of direct evidence, courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001). Under that framework, the plaintiff must first establish a *prima facie* case before the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 314-316. If the employer carries this burden, the plaintiff must then show that this nondiscriminatory reason was in fact pretextual. *Id.* at 315. A plaintiff can make out a *prima facie* case of discrimination by showing that (1) she availed herself of a protected right under the FMLA by notifying her employer of her intent to take leave, (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *See id.* at 314.

The first prong presents a roadblock to Plaintiff's ability to make a *prima facie* case. The initial proposal to eliminate Plaintiff's position was made in mid-October 2013. ECF No. 34-10 at PageID #: 434, 22:21-23:5. The decision was finalized on October 31, 2013. ECF No. 34-10 at PageID #: 435, 25:8-26:8; ECF No. 34-14 at PageID #452, Interrog. 12. At that point, the only requests Plaintiff had made were for (1) an alternative work arrangement that allowed her to work from home two days a week, (2) a vacation day for personal reasons, and (3) a half-day to attend her uncle's funeral. Plaintiff did not inquire about FMLA until November 4, 2013, when OA readily provided her the necessary information to request leave. ECF No. 34-3 at PageID #: 269, 36:18-37:9. Plaintiff did not avail herself of a protected right under FMLA until after

14

(5:14CV00127)

Defendant had made the decision to terminate her.  That Plaintiff was informed of her

termination on November 15, 2013, after she had inquired about FMLA, is irrelevant.  "The key

date in retaliation claims is the date of the decision to terminate the employee, not the date the

decision is communicated to the employee." *Barnett v. Autlman Hosp.*, No. 5:11–399, 2012 WL

5378738, at *10 (N.D. Ohio, October 31, 2012) (citing *Thompson v. Gynecologic Oncology &*

*Pelvic Surgery Associates*, 2006 WL 3491738 at ¶¶11, 32) (relevant date against which to

evaluate plaintiff's claim is the termination date, not the time of communication to plaintiff).

The operative date, therefore, is October 31, 2013.  Under a retaliation theory:

> the employer's motive is an integral part of the analysis, Plaintiff must establish
> that those responsible for the termination decision had knowledge of her protected
> FMLA action.  As the Sixth Circuit explained in *Edgar v. Jac Products, Inc.,*
> "The employer's motive is relevant because retaliation claims impose liability on
> employers that act against employees specifically *because* those employees
> invoked their FMLA rights." *Edgar v. Jac Products, Inc.*, 443 F.3d 501, 508
> (6thDir. 2006) (emphasis in original).

*Barnett*, 2012 WL 5378738, at *11.   In this case, because Defendant's decision to terminate

Plaintiff preceded her FMLA inquiries, Plaintiff cannot establish that those responsible for her

termination decision had knowledge of her protected FMLA right.  Plaintiff had yet to formally

file her FMLA request at the time she was notified of her termination.  *See*  ECF No. 34-3 at

PageID #: 269, 36:18-37:9 (confirming that Plaintiff had not asked about FMLA leave prior to

November 4, 2013).  The chronology of events precludes Plaintiff's FMLA claim.

Plaintiff nonetheless argues that FMLA imposes an affirmative duty on employers to

notify an employee of her FMLA rights if the employer is aware of an employee's personal

situation and FMLA eligibility.  The law imposes no such requirement.  Plaintiff relies on

15

(5:14CV00127)

several, distinguishable cases in support of her flawed proposition.  In *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 723-24 (6th Cir. 2003), for example, the Sixth Circuit found the employer's rigid notice policy inconsistent with the FMLA and determined that the plaintiff had given sufficient notice to his employer of his request to take time off because he informed his employer "(1) that he had been at the hospital, and (2) that he was unable to work due to his injury." *Id.* at 725.  In the matter before the Court, Plaintiff at no point informed Defendant that she was unable to work.  In fact, she sought special arrangements so that she could work.   In *Sahadi v. Per-se Technologies, Inc.*, 280 F.Supp.2d 689, 697 (E.D. Mich. 2003), which Plaintiff argues is similar to the case at bar, the court determined that a plaintiff did not need to specifically invoke the FMLA when requesting intermittent unforeseeable leave due to a family member's medical condition.  The plaintiff in *Sahadi* requested leave without specifically invoking the FMLA.  *Id.*  An employee does not have to invoke FMLA expressly by name, but "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir.1998). "[N]othing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee." *Id.*  In the matter before the Court, Plaintiff had not made any requests for leave.  She had requested an alternative work schedule in which she would continue to work, but from home two days a week.  The following exchange occurred during Plaintiff's deposition:

> Q: Prior to November 4, 2013, had you ever asked anybody about FMLA leave at Timken?
> A: No I had asked about special arrangements.
> Q: An alternative work arrangement?

16

(5:14CV00127)

> A: Yes.
> Q: . . .So before November4, 2013, you had never had any discusions with anyone at Timken about taking an FMLA leave?
> A: Correct

ECF No. 34-3 at PageID #: 269, 36:25-37:9.  As the Sixth Circuit has stated, "[w]orking from home is still working . . . not a request for leave under the FMLA." *Anderson v. McIntosh Const., LLC*, No. 14-5783, 2015 WL 105979, at *2 (6th Cir. Jan. 8, 2015).  Plaintiff testified that the approval of her work-from-home arrangement just meant that twice a week, she would be doing what she did in the office at her home.  ECF No. 34-3 at PageID #: 280, 78:13-17.

Plaintiff cites 29 C.F.R. § 825.300(d) to argue that Defendant's knowledge of Plaintiff caring for someone with a health condition imposed a duty to inform Plaintiff of her potential FMLA eligibility.  The regulation states, in relevant part, "[w]hen the employer has enough information to determine whether *the leave* is being taken for a FMLA-qualifying reason (*e.g.*, after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances."  29 C.F.R. § 825.300(d) (emphasis added).  Again, the crux of the issue before the Court is that Plaintiff failed to ever request leave, precluding the applicability of the regulation.  Defendant accommodated Plaintiff's request for an alternative work schedule.  There can be no retaliatory motive when the notice of leave occurred after Defendant had made its termination decision.  Defendant's motion for summary judgment on Plaintiff's FMLA claim is granted.

(5:14CV00127)

### B. Americans with Disabilities Act

Plaintiff also claims that her "association with the disabled Mr. Lawrence was a motivating and/or determining factor in the retaliation, harassment and pre-textual termination of Plaintiff's employment."  ECF No. 7 at PageID #: 32 ¶ 32.  The Americans with Disabilities Act (ADA) applies when there is a disabled person within the meaning of the Act.  Under the ADA, an individual is disabled if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.  *Olds v. United Parcel Service, Inc.*, No. 03–1920, 2005 WL 742804, at *2 (6th Cir. Apr. 1, 2005) (citing 42 U.S.C. § 12102(2)); *Stokes v. Hamilton County, Tenn.*, No. 03–5751, 2004 WL 2452549, at *2 (6th Cir. Oct. 28, 2004).

A person with cancer may or may not be disabled, depending on the diagnosis of impairment, if any.  The cancer may be in remission, or it may be treatable and result in temporary limits, or it may be totally disabling, depending on the individual's circumstances.  *See*, *e.g.*, *Olds*, 2005 WL 742804, at *2 (although diagnosed with cancer, plaintiff was not so physically impaired that he was disabled as defined by the ADA).  Defendant does not challenge Plaintiff's claim on whether the disability label is proper.  The record also establishes that Mr. Lawrence's condition was totally disabling, resulting in his unfortunate death.  Defendant does contend, however, that Plaintiff's "claim is procedurally deficient because she failed to timely exhaust administrative remedies with the EEOC" and that Plaintiff's "ADA claim for associational discrimination fails on the merits, as there is no evidence of a discriminatory motive."  ECF No. 34-1 at Page ID #: 251; 255.

18

(5:14CV00127)

### 1. Whether Ohio Law Recognizes Associational Discrimination Claims

In order to file a claim under the ADA, a plaintiff must first file a timely complaint with the Equal Employment Opportunity Commission ("EEOC") within 180 days or 300 days, depending upon state law. 42 U.S.C. § 2000e-5(e)(1). The federal statute explains:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge . . . shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency *with authority to grant or seek relief from such practice* . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

*Id.* (emphasis added). In the instant case, Plaintiff filed her claim with the Ohio Civil Rights Commission ("OCRC") on the 300th day after her termination. ECF No. 34-13. The ADA explicitly forbids employment discrimination against a "qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). While the Ohio discrimination statute makes it an unlawful discriminatory practice for an employer to discriminate against an employee on account of a disability, it does not contain a comparable prohibition against employment discrimination based on *association*. R.C. § 4112.02(A). Defendant argues that the OCRC does not have authority to grant relief to Plaintiff because Ohio law does not recognize associational disability claims, restricting Plaintiff to filing her EEOC claim within 180 days of accrual. Because Plaintiff filed her associational disability claim on the 300th day without entitlement to the extension of time, Defendant argues, the Court should grant summary judgment in favor of Defendant on the basis of procedural untimeliness.

19

(5:14CV00127)

"Courts have not been unanimous in determining whether Ohio law permits a claim for associational discrimination." *Berry v. Frank's Auto Body Carstar, Inc.*, 817 F.Supp.2d 1037, 1048 (S.D. Ohio 2011) *aff'd on other grounds,* 495 F. App'x 623, 2012 WL 3553505 (6th Cir. 2012), (citing *Maxwell v. City of Columbus*, No. 2:08-CV-264, 2011 WL 2493525 (S.D. Ohio June 21, 2011).  The Defendant points to two unpublished Sixth Circuit opinions for the proposition that Ohio law does not recognize associational discrimination claims.  In *Kepreos v. Alcon Laboratories, Inc.*, 520 F. App'x 375, 376 (2013), although plaintiff had abandoned her ADA claim on appeal, the Court nonetheless continued to address it, stating that "because [Plaintiff's] ADA claim was 'associational' in nature and because Ohio's disability-discrimination statute does not provide for such a claim . . . the district court correctly ruled that the plaintiff could not assert it under state law." *Id.*  In *Smith v. Hinkle Manufacturing Inc.*, 36 F. App'x 825, 831 (6th Cir. 2002), the Court similarly stated that Ohio law does not recognize a claim for associational discrimination.  Neither *Smith* nor *Kepreos* examine how Ohio state courts have dealt with associational discrimination claims.  *See Edizer v. Muskingum Univ.*, No. 2:11-CV-799, 2012 WL 4499030 (S.D. Ohio Sept. 28, 2012) ("While the Sixth Circuit has said in dicta that Ohio Revised Code § 4112.02 does not recognize a claim for associational discrimination . . . Ohio courts confronting the issue directly have held to the contrary.").

A review of decisions from Ohio courts, however, reveals that associational discrimination claims may be valid under Ohio law.  The Ohio Supreme Court held that a plaintiff could bring an associational discrimination claim against a place of public accommodation on the basis of her association with a black person.  *Ohio Civil Rights Com. v.*

20

(5:14CV00127)

*Lysyj*, 38 Ohio St. 2d 217, 313 N.E.2d 3 (1974), *superseded by statute on other grounds*, *Rice v. CertainTeed, Corp.*, 84 Ohio St.3d 417, 704 N.E.2d 1217 (1999).  Defendant in *Lysyj* argued that Ohio Revised Code. § 4112.02 protected only those directly discriminated against on the basis of a protected characteristic and not on the basis of their associates.  *Lysyj*, 38 Ohio St. at 221.  The Ohio Supreme Court rejected that argument, stating:

> The protection afforded by R.C. 4112.02(G) cannot be held to extend only to persons of a single or minority race.  When determining whether there has been unlawful discrimination under R.C. 4112.02(G), the test is simply whether the proprietor, keeper, manager, or employee of a place of public accommodation has denied to any person the full enjoyment of such place for reasons not applicable alike to all persons, irrespective of race, color, religion, national origin or ancestry.

*Id.*  The Ohio Court of Appeals further extended *Lysyj*'s reasoning to apply directly to employment situations, stating:

> We believe that the Ohio Supreme Court's decision in *Lysyj* mandates the disposition of the case *sub judice* in Cole's favor.  We discern no reason to interpret two sections of the same statute differently merely because one speaks to employment and the other addresses public accommodations.  *The intent of the statute is the same in all sections: to prohibit discrimination.*  Therefore, the Ohio Supreme Court's interpretation of R.C. 4112.02(G) to include a proscription against discrimination based on association must be applied to R.C. 4112.02(A).

*Cole v. Seafare Enterprises Ltd., Inc.*, No. C-950157, 1996 WL 60970, at *2 (Ohio Ct.App. Feb.14, 1996) (emphasis added). These cases present divergent views on Ohio's recognition of associational disability claims.  Despite the temptation to respond, the Court need not weigh in on this issue.  Because Plaintiff's ADA claim fails on its merits, whether Ohio courts recognize associational discrimination claims based on disability will remain a question of great import for another day.

21

(5:14CV00127)

## 2. Whether Plaintiff Has a Meritorious Claim under the ADA

Associational discrimination claims generally fall into three theories: 1) expense, 2) disability by association, and 3) distraction. *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). *Stansberry* held:

> The "expense" theory covers situations where an employee suffers an adverse employment action because of his or her association with a disabled individual covered under the employer's health plan, which is costly to the employer . . . The "distraction" theory is based on the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated.

*Id.* (quoting *Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004). Plaintiff does not expressly bring her claim under one of the three theories. She does not suggest that Defendant feared she might develop lung cancer by association. At best, Plaintiff advances her complaint under the first and third theory. Plaintiff stated "[d]uring the course of Plaintiff's employment, Defendant had actual notice of Plaintiff's fiancé/husband relationship and association with William Lawrence. Mr. Lawrence was also covered under spousal medical insurance benefits offered by Defendant after Plaintiff's marriage . . . in August of 2013." ECF No. 7 at PageID #: 32 ¶ 31. Plaintiff also alleges that she was verbally harassed by her supervisor. ECF No. 7 at PageID #: 30 ¶ 19.

### a. Plaintiff's *Prima Facie* Case of Associational Discrimination

Defendant argues that even if Plaintiff's ADA claim is not procedurally defaulted, the claim still fails on the merits. Because Plaintiff does not offer any direct evidence of discrimination, her claim, as she readily admits, must be analyzed through a *McDonnell Douglass*-like burden-shifting test. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th

(5:14CV00127)

Cir. 2010).  To establish a *prima facie* case of associational discrimination under the ADA, a

plaintiff must show that: "(1) the employee was qualified for the position; (2) the employee was

subject to an adverse employment action; (3) the employee was known to be associated with a

disabled individual; and (4) the adverse employment action occurred under circumstances that

raise a reasonable inference that the disability of the relative was a determining factor in the

decision." *Stansberry*, 651 F.3d at 487.   Recently, the Sixth Circuit clarified the fourth element

of an ADA discrimination claim, finding that since the ADA bars discrimination "because of"

the disability, the relevant question is whether the employer would have taken the adverse action

"but for" the disability.  *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th

Cir.2012) (en banc).  Should the plaintiff be successful in establishing the *prima facie* case, the

burden then shifts to the defendant to come forth with a legitimate reason for the adverse action;

should the defendant do so, the burden then shifts back to the plaintiff to show that the

defendant's reason is pretextual.  *Stansberry*, 651 F.3d at 488.

　　　　Plaintiff was indeed qualified for her position as a Principal Forecasting Analyst, having

been in that position for over a year after a promotion.  Zollinger testified that the Mobile

Industries forecasts that Plaintiff worked on were more accurate than other business segment

forecasts.  At this stage, only Plaintiff's "objective" qualifications matter.  *See Upshaw v. Ford

Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Wexler v. White's Fine Furniture, Inc.*, 317

F.3d 564, 575–76 (6th Cir.2003) (en banc) (holding that the assessment of qualifications at the

*prima facie* stage includes only "objective" qualifications)).  There is also no doubt that Plaintiff

was subject to an adverse employment action, since she was terminated.  *See E.E.O.C. v.*

23

(5:14CV00127)

*SunDance Rehab. Corp.*, 466 F.3d 490, 501-02 (6th Cir. 2006) ("'Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation.'") (quoting *Smith v. City of Salem*, 378 F.3d 566, 575-76 (6th Cir. 2004)).

It is questionable whether Plaintiff was known to be associated with a disabled individual at the time the decision to eliminate her position was made.  In July 2013, Plaintiff informed Zollinger of her association with someone with a disability.  Plaintiff then requested an alternative work schedule that would allow her to work from home two days a week.  Zollinger informed Chadwick of Plaintiff's request and received approval from Chadwick and OA.  Morgan, who initially proposed Plaintiff's termination, testified that he was unaware of Plaintiff's association with someone with a disability at the time that he initially proposed eliminating her position, although he learned of the association during the late stages of Project Red.  ECF No. 34-6 at PageID #: 369, 29:2-30:3.  The final decision to terminate Plaintiff was made on October 31, 2013.  Viewing the facts in a light most favorable to Plaintiff, therefore, the Court finds that a jury could conclude that Defendant knew Plaintiff to be associated with a disabled individual.

Plaintiff falls short, however, in satisfying the fourth prong: that the adverse employment action occurred during circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision.  It is quite unfortunate that Plaintiff's fiancé-husband suffered from an illness that required her frequent care and his eventual death.  It is also unfortunate that, around the same time, Plaintiff's job became the subject of elimination.  But

24

(5:14CV00127)

given the facts on record, even when viewed in a light most favorable to Plaintiff, the Court can make no reasonable inference that Mr. Lawrence's disability was a determining factor in the decision to terminate Plaintiff. In other words, Mr. Lawrence's disability was not a "but for" cause of Plaintiff's termination. Plaintiff cannot establish a *prima facie* case of associational discrimination because she lacks evidence of causation—that the adverse action was taken because of her association with an individual with a disability.

Defendant does not have a policy allowing alternative work arrangements. The ADA does not require an employer to offer an employee a reasonable accommodation on account of an employee's relative's disability. *Stansberry*, 651 F.3d at 489. Still, Defendant allowed Plaintiff to work from home two days a week for approximately three months in an attempt to make Plaintiff's work-life balance easier.

Plaintiff admitted that performing laborious manual entries for the sales forecast was at least 70% of her job responsibilities. Although automation did not completely eliminate Plaintiff's duties, it did eliminate the need to have a full-time position devoted to sales forecasting in Mobile Industries. Logility reduced sales forecasting reporting from once a month to once every two months, and it reduced the time devoted to generating reports from three weeks of every month to only ten days of every other month. Defendant decided to eliminate all positions on the Sales Forecasting team of Mobile Industries as part of Project Red. Plaintiff had worked at Timken for 3 years, significantly shorter time period than the 10-17 year range of her fellow team members. Chadwick, Martin, and Morgan were consistent in their testimony that

25

(5:14CV00127)

while seniority was not a factor in deciding which positions would be eliminated, it was a factor in determining who would be transferred to other positions within the company.

No reasonable inference can be made under an expense theory. Chadwick testified that in considering the impact that layoffs would have on benefits, the company looked at cost-savings generally and did not examine the benefits attached to any individual employee. Plaintiff offers no evidence to refute this testimony. Nor can any reasonable inference be made under a distraction theory, even after considering Zollinger's frequent inquiries as to when Plaintiff would be able to return to a normal work schedule. E-mails from Zollinger and Chadwick do express concern about whether Plaintiff was able to fulfill her work responsibilities while juggling care for her husband. The November 1, 2013 e-mail demonstrates that Chadwick sought advice from Martin regarding how to deal with Plaintiff's unexcused absence, stating "[w]e are trying to be sensitive to the personal situation, but also firm in our expectations. Should we take any disciplinary actions . . . *or not since she is on the project red list?*" ECF No. 45-5 (emphasis added). Chadwick recognized the potential irrelevancy in disciplining Plaintiff. The inquiry shows that any performance concerns created by Plaintiff's alternative work arrangement were independent from the reality of Plaintiff's impending job termination. It also undercuts any inference that Plaintiff's termination resulted from frustrations with her alternative work arrangement. Additionally, Plaintiff testified that while employed, she never felt that anyone was discriminating against her as a result of her husband's condition. ECF No. 34-3 at PageID #: 292 at 127:24-128:2. In light of these facts and Plaintiff's lack of seniority, the Court cannot make a reasonable inference that Defendant terminated Plaintiff because of unfounded

26

(5:14CV00127)

fears that Plaintiff's association with her husband would cause her to become distracted at work. *Stansberry*, 651 F.3d at 486.  Plaintiff has not come forward with enough evidence to establish a *prima facie* case of discrimination.  *See id.* at 488 ("A plaintiff cannot bypass the prima facie showing requirement and must offer some evidence to suggest that the adverse employment action he or she suffered was due in some measure to discriminatory animus before the employer is required to articulate a non-discriminatory reason for the action") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-148 (2000)).

### b.      Defendant's Non-Discriminatory Reason for Termination

Alternatively, even assuming Plaintiff could make out a *prima facie* case, she would nonetheless be unsuccessful in her attempt to overcome summary judgment because Defendant's implementation of Logility and reduction in force (RIF) efforts were legitimate non-discriminatory reasons to terminate her.  The Sixth Circuit has repeatedly held that an employer can establish a legitimate, nondiscriminatory reason for terminating a plaintiff by showing that the termination was part of a RIF.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1468 (6th Cir. 1990); *Messner v. Lockheed Martin Energy Systems*, 126 F.Supp.2d 502, 520 (E.D. Tenn. 2000).  Under *McDonnell Douglas*, the burden shifts to Plaintiff to prove that Defendant's articulated reason is mere pretext.  Plaintiff has failed to adduce evidence from which a reasonable jury could find that Defendant's reasons were merely pretext for impermissible discrimination.  Plaintiff retorts that other employees with fewer years at the company joined the newly-created C.F.A.S.T. team.  Be that as it may, there is no requirement that Defendant find placement in another position for

27

(5:14CV00127)

every employee when it is undergoing reorganization and RIF. Furthermore, Plaintiff had the least seniority among the members of the Sales Forecasting group in Mobile Industries. Plaintiff also points to the job posting for a Senior Financial Analyst in October 2014 as indicia of a pretextual motive. But the Court cannot expect Defendant's employment needs to remain the same almost a year after Plaintiff's termination. Employees leave the company and are transferred to different departments, as was the case with Meghan Dietz. A company must be able to respond to its dynamic needs.

Plaintiff urges the Court to find that Defendant has contradicted itself by stating that Morgan was the sole decision-maker for Plaintiff's termination (ECF No. 45 at PageID #: 857), even though Chadwick testified that the decision was a collaborative effort among her, Morgan, and Zollinger. Zollinger testified that Chadwick did not ask her for her input regarding the selection of employees to be terminated. Plaintiff's argument is unpersuasive. Morgan initially proposed terminating Plaintiff. Chadwick participated in identifying positions for elimination, given her involvement with the implementation of Logility in Mobile Industries. Zollinger, as manager of the Sales Forecasting group, provided information that others used to identify specific positions to eliminate, but was not asked to identify those positions herself. The record establishes that the decision started with Morgan and included Chadwick and Zollinger to varying degrees.

The record does not reveal any instances of harassment against Plaintiff. If anything, the record reveals a company trying to meet its business needs while balancing sensitivity to an

28

(5:14CV00127)

employee's personal situation.  Defendant is entitled to summary judgment because Plaintiff

cannot establish a *prima facie* case of discrimination.

### IV.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment

in its entirety.  Plaintiff's claims are hereby dismissed.

IT IS SO ORDERED.

August 31, 2015                                      _/s/ Benita Y. Pearson_____
Date                                                        Benita Y. Pearson
                                                               United States District Judge

29